SECURITIES AND EXCHANGE COM-MISSION, Plaintiff-Appellant,

v.

SPECTRUM, LTD., et al., Defendants,

Stuart Schiffman, Defendant-Appellee.

No. 93, Docket 72–2369.

United States Court of Appeals, Second Circuit.

Argued Nov. 14, 1973.

Decided Dec. 4, 1973.

**536**

Theodore Sonde, Asst. Gen. Counsel, Washington, D. C. (Walter P. North,

Acting Gen. Counsel, David Ferber, Sol., Mark Q. Connelly, Atty., Securities and Exchange Commission, Washington, D. C., on the brief), for plaintiff-appellant.

Barry Feiner, New York City (Feiner, Curtis, Smith & Goldman, New York City, on the brief), for defendant-appellee.

Before KAUFMAN, Chief Judge, and SMITH and OAKES, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

The securities laws provide a myriad of safeguards designed to protect the interests of the investing public. Effective implementation of these safeguards, however, depends in large measure on the members of the bar who serve in an advisory capacity to those engaged in securities transactions. The standard of diligence demanded of the legal profession to meet this responsibility is a matter on which we are required to comment in the resolution of this appeal.

On April 2, 1971, the Securities and Exchange Commission [SEC] filed a complaint charging twelve defendants,[1] including the appellee, Stuart Schiffman, with participation in a partially successful scheme to distribute over one million unregistered shares of the common stock of Spectrum, Ltd. in violation of the registration provisions of the Securities Act of 1933 [the 1933 Act] (15 U.S.C. § 77e) and the antifraud provisions of that Act (15 U.S.C. § 77q(a)) and of the Securities Exchange Act of 1934 [the 1934 Act] (15 U.S.C. § 78j(b)). Although the Commission has obtained permanent injunctions against at least ten of the defendants,[2] it was unsuccessful in its effort to gain preliminary injunctive relief against Schiffman, an attorney who allegedly prepared an opinion letter on the basis of which some of the unregistered securities were sold. Judge Tenney, after reviewing the

---

1. Spectrum, Ltd., Louis Israel Marder, Central National Fund, James W. Morse, Michael Gardner, Michael Karfunkel, George Karfunkel, Stuart Schiffman, Quido Benigno, Edward T. Carroll, Bernard L. Goldenberg, and Joseph W. Dye.

2. These injunctions have been entered upon consent or default or, in the case of Spectrum, upon the Commission's motion for summary judgment. SEC v. Spectrum, Ltd., 54 F.R.D. 70 (S.D.N.Y.1972).

affidavits, cross-affidavits, exhibits, and depositions filed by the SEC and by Schiffman, denied the SEC's request for an evidentiary hearing, on the grounds that there were no material facts in dispute, and concluded that Schiffman's conduct, although perhaps negligent,[3] did not rise to a violation of the securities laws. Upon a careful examination of the record, we find the existence of a highly material factual conflict. Accordingly, we reverse and remand to Judge Tenney for an evidentiary hearing in which the disputed issues can be resolved.

## I.

A detailed account of the intricacies of the multi-party stock manipulation venture which prompted this action, the principal features of which were unchallenged below,[4] is set forth in the extensive supporting affidavit filed by the SEC. For purposes of this appeal, however, we limit our recitation to background information necessary for an understanding of Schiffman's alleged role in the scheme.

In September, 1969, Louis Marder, representing the Westward Investment Corporation, and Bernard Goldenberg and Joseph Dye, representing Spectrum, Ltd., agreed to a merger of Westward into Spectrum. The purpose of this merger was to provide a vehicle for the distribution of unregistered Spectrum securities which could later be sold to an unwitting public.

Section 5(c) of the 1933 Act states that "it shall be unlawful for any person, directly or indirectly . . . to sell . . . any security unless a registration statement has been filed as to such security." 15 U.S.C. § 77e. To avoid this registration requirement, a plan was devised, principally by Marder and Goldenberg, which relied on a two-step procedure for securing exemption from Section 5. First, a large block of unregistered Spectrum common stock would be issued to the shareholders of Westward in the merger of Westward into Spectrum. This stock would be exempt from the registration mandate of Section 5 pursuant to Commission Rule 133,[5] which provided that the exchange of shares between a surviving corporation and the shareholders of a disappearing corporation in the course of a merger would not be considered a "sale" within the purview of Section 5.[6] Second, under Section 4(1) of the 1933 Act, the recipients of this unregistered Spectrum stock would be able to dispose of these securities, again without the filing of a registration statement as a predicate to the transaction, as long as the seller was not deemed to be "an issuer, underwriter or dealer" under the Act.

For Marder, who controlled Westward, successful implementation of this plan presented one obvious stumbling block —Rule 133 classified a controlling shareholder of the "constituent corporation" (Westward) as an "underwriter" and, therefore, a person not qualified for exemption under Section 4(1). Ac-

---

3. We do not consider Judge Tenney's statement that Schiffman "may have been guilty of some negligence in preparing the opinion letter" to constitute an express finding of such negligence. Nor do we believe the record to be sufficiently certain in its description of Schiffman's conduct to permit a finding of negligence at this preliminary stage.

4. See note 2 *supra*.

5. 17 C.F.R. § 230.133 (1973). Rule 133 was rescinded effective January 1, 1973. 37 Fed.Reg. 23636 (1972). It has been replaced by Rule 145, 17 C.F.R. § 230.145

(1973), which no longer provides a registration exemption for securities issued in the course of a merger.

6. Rule 133 conditioned exemption on the submission of the merger proposal to a vote of the disappearing corporation's shareholders. Although no such vote was taken, Marder apparently hoped to conceal this omission. We should add that even if a vote had been taken, the distribution would not have qualified for a Rule 133 exemption because of the existence of the illicit scheme at the time of the merger agreement. SEC v. Micro-Moisture Controls, Inc., 148 F.Supp. 558, 562 (S.D.N.Y.1957).

cordingly, prior to the merger Marder commenced distributing some of his Westward shares to various friends, many of whom, as the court below found, were in fact unaware of their status as Westward shareholders. Following the merger, Marder intended to effect the sale of the Spectrum stock received by his acquaintances in transactions which, because of the stock's nominal ownership by non-controlling former Westward shareholders, would appear to satisfy the criteria for a Section 4(1) exemption.

The stage was set for the successful charade upon consummation of the Spectrum-Westward merger on November 10, 1969. Of the 4,596,465 shares of Spectrum stock issued in the exchange, approximately one million shares went to Marder's corps of nominees. By obtaining the necessary stock powers from these individuals, Marder was in a position to begin the illicit sale of unregistered Spectrum securities.

On the day of the merger, November 10, Spectrum's general counsel, Morton Berger, wrote an opinion letter to Spectrum's transfer agent in which he instructed the agent on the proper classification of the Spectrum shares then being issued. Berger's letter, based upon representations by Goldenberg and Marder, included his opinion that the merger complied with the requirements of Rule 133 and that certain recipients of the newly-issued Spectrum stock should receive shares labelled "restricted"—i. e. not for public sale—because these former Westward shareholders, whom Berger listed, were considered to be "underwriters" pursuant to Rule 133(c). Berger concluded his letter by opining that the remaining former Westward shareholders, whose names Berger did not recite, could be issued Spectrum securities without a restrictive legend.[7]

On November 25, 1969, Berger wrote a second letter, this time to the president of Spectrum, in which he listed those persons who had received unrestricted shares of Spectrum stock pursuant to the merger. This letter, however, was not in the form of an opinion letter.

Retracing our steps, on November 13 and November 28, 1969, Marder delivered for sale a total of 125,000 shares of unrestricted Spectrum stock, nominally owned by William and John Doyen, to Michael Gardner, a principal at the registered broker-dealer firm of Gardner Securities. Gardner balked at the sale of these unregistered securities, despite their unrestricted nature, insisting upon an opinion letter which stated that these shares were considered exempt from the registration requirements of Section 5. Although Marder possessed the Berger letters of November 10 and November 25, Gardner viewed them as insufficient, apparently because the November 10 letter failed to specify the individuals entitled to exemption, while the November 25 letter did not purport to be an opinion letter.

Although Gardner called Berger about preparing the requisite opinion letter, Berger refused to issue such a letter on behalf of any shareholder. Because of this refusal, Gardner communicated with Schiffman stating that he wished to discuss a securities matter the details of which Gardner failed to provide on the telephone. Schiffman responded by meeting Gardner at his office.

It is at this juncture—Schiffman's debut so to speak—that the crucial factual controversy arises. According to Schiffman's affidavit submitted in opposition to the motion for a preliminary injunction, he visited Gardner's office twice in late November. On the first occasion, he and Gardner spoke in general terms about Gardner's securities business and Gardner introduced him to James Morse,

---

7. Schiffman makes much of the fact that Berger, whose opinion letter of November 10 was a critical element in the scheme, was not joined as a defendant below. Although Berger's conduct was far from exemplary, we see no reason to question the Commission's discretion in declining to name Berger in the complaint.

one of Gardner's clients. At the second meeting, several days later, Morse was again present at Gardner's office. On this occasion, Morse mentioned that a friend of his, a Mr. Doyen, was in need of some help and asked Schiffman if he would speak to Doyen. After Schiffman agreed, Morse telephoned Doyen. Morse handed the instrument to Schiffman and Doyen proceeded to explain to Schiffman that he owned some unregistered stock in Spectrum, Ltd. for which he wanted an opinion letter that would indicate that the securities could be sold without registration. Schiffman allegedly responded that since he had no knowledge of the underlying transactions, he would be hesitant to write such a letter. But, Schiffman claims that his reluctance was overcome when Morse showed him the two Berger letters. Schiffman then proceeded to advise Doyen that he would prepare an opinion letter which would "verify" Berger's opinion.

Schiffman's version of these meetings at Gardner's office is sharply in conflict with Gardner's recollection of the events, as described in his affidavit submitted by the SEC. Gardner recalls only one meeting with Schiffman at which not only Morse was present but Louis Marder as well. Gardner's affidavit then notes, quite specifically, that

> I [Gardner] introduced Schiffman to Marder and Morse for the purpose of Schiffman representing Marder and Morse. Marder and Morse asked Schiffman, in my presence, to prepare an opinion letter for securities of Spectrum that were going to be sold *by Marder and Morse.* [emphasis added]

The affidavit concludes with the statement: ·

> I do not recall at any time . . . Morse telephoning one William Doyen, giving the telephone to Schiffman, and Schiffman speaking to Doyen about an opinion letter to be prepared by Schiffman concerning either Doyen's stock, or any other stock.

In any event, Gardner was evidently satisfied that Schiffman would write the opinion letter because, sometime before its preparation, he proceeded to sell 50,000 shares of Spectrum stock jointly owned by the Doyens. As for Schiffman, he claims to have arranged a conference with Berger so that he could learn more about the Spectrum stock for which he had agreed to write an opinion letter.

What transpired at this meeting between Schiffman and Berger is also the subject of conflicting documentary versions. Both men agree that Berger gave Schiffman the two letters dated November 10 and November 25. Berger, however, in his affidavit submitted in the preliminary injunction proceeding, added that he warned Schiffman that he "suspected that this stock [the unregistered Spectrum securities] was going to be traded by a control person and therefore the stock should not be freely traded." This account did not appear in Berger's two prior depositions, also part of the record below. Schiffman, on the other hand, in his reply affidavit, denied that Berger uttered any warning whatsoever.

It is uncontroverted that following this meeting Schiffman prepared an opinion letter which closely paralleled the Berger opinion letter of November 10 with one key addition—it contained the names of those shareholders, mentioned only as a group by Berger, who could sell their Spectrum stock in a transaction exempt from the registration requirement of Section 5. Although Schiffman's letter, dated December 4, was addressed to Doyen, Schiffman delivered it to Gardner's office because Schiffman had never received Doyen's address. Subsequently, on December 8, Schiffman sent a second letter to Doyen, again through Gardner's office, in which Schiffman stated that his opinion letter of December 4 was not to be used for the sale of unregistered Spectrum stock. No such caveat, how-

ever, was incorporated in the December 4 letter.

The use to which Schiffman's opinion letter of December 4 was put is a matter of some uncertainty. The SEC has alleged that in January, 1970, Marder showed the Schiffman letter to "Canadian citizen # 1" in order to assure this anonymous Canadian that the Spectrum shares that he had agreed to purchase from Marder could be traded without registration. The SEC charges that "Canadian citizen # 1" subsequently sold 15,000 shares of this unregistered Spectrum stock in the Canadian market. Although these allegations were never contested by Schiffman, they also remain unsupported by any independent evidence.

Eighteen months after this documentary joust commenced, Judge Tenney, on October 10, 1972, denied the SEC's request for a preliminary injunction to enjoin Schiffman from further violations of §§ 5(a), 5(c) and 17(a) of the 1933 Act and § 10(b) of the 1934 Act. He concluded that there was no evidence, apart from the bare allegations by the SEC, that any unregistered Spectrum stock had been sold on the basis of Schiffman's opinion letter. Recognizing that Schiffman might still have violated the securities laws as an aider and abettor, the district court, after pronouncing a standard of liability which required actual knowledge of the illegal scheme, found a dearth of credible evidence in the papers before him to sustain a finding of such knowledge on Schiffman's part. Judge Tenney finally noted that even if Schiffman were considered negligent in preparing his opinion letter, there had been no showing that, unless enjoined, he would be likely to run afoul of the law in the future.

## II.

■■ We should note, at the outset, that had the denial of temporary injunctive relief been based solely on the failure to demonstrate a propensity for fu-

ture violations, we would hesitate before disturbing such conclusion. SEC v. Bangor Punta, 331 F.Supp. 1154 (S.D. N.Y.1971), aff'd sub nom. Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 393–395 (2d Cir. 1973), cert. denied, 414 U.S. 924, 94 S.Ct. 234, 38 L.Ed.2d 158 (1973). Judge Tenney, however, went well beyond this rationale, finding no evidence whatsoever of any violation, nor even sufficient factual uncertainty to justify an evidentiary hearing. It is especially as to this latter holding, the declination to hold an evidentiary hearing, that we find error for we believe that the district judge failed to properly heed our admonition that "a judge should not resolve a factual dispute on affidavits or depositions for then he is merely showing a preference for 'one piece of paper to another.' Sims v. Greene, 161 F.2d 87, 88 (3d Cir. 1947)." Dopp v. Franklin National Bank, 461 F.2d 873, 879 (2d Cir. 1972).

■ As in *Dopp*, we need give no special deference to the district court's finding that there were no material issues of fact in dispute for "we are in as good a position as [he] to read and interpret the pleadings, affidavits and depositions. . . . " *Ibid.* Examination of this record, moreover, discloses a sharp factual conflict bearing heavily on the critical question of Schiffman's actual knowledge of the scheme to illicitly distribute unregistered Spectrum stock at the time he agreed to draft the December 4 opinion letter.

On Schiffman's part, he has steadfastly maintained that he was ignorant of the Marder plan. Yet, these protestations of innocence are met squarely on two fronts—by the affidavits of Gardner and Berger. Although we do not disagree with the district court that the Berger affidavit would seem to be incredible on its face in light of Berger's failure to make any mention of his alleged warning to Schiffman in the course of two prior depositions, we cannot overlook the dispute between Gardner and Schiffman over the events and

participants at the crucial meeting[8] at Gardner's office in late November, 1969. If Gardner's statement that Marder personally asked Schiffman for an opinion letter so that Marder could sell unregistered Spectrum stock is true—and only a hearing could determine this—then Schiffman's claim of unawareness of the scheme would appear thin. To be sure, Gardner's veracity may be questioned,[9] but no more nor less than Schiffman's, in view of Schiffman's stake in the outcome of this lawsuit. Accordingly, since oral testimony is a medium far superior for evaluating credibility than the cold written word, we consider an evidentiary hearing essential to the proper disposition of this case. *See* SEC v. Frank, 388 F.2d 486 (2d Cir.1968).

## III.

Since our decision necessitates further proceedings in the lower court, we would be remiss if we failed to comment on the appropriate rule of law to be applied by the district judge. Judge Tenney properly recognized that if Schiffman's opinion letter were in fact used to sell unregistered Spectrum stock in violation of Section 5,[10] although his status as an "underwriter" might be uncertain,[11] he could be liable, nevertheless, as an aider and abettor to Marder's illicit venture. SEC v. North American Research & Development Corp., 424 F.2d 63, 82 (2d Cir. 1970). In assessing liability as an aider and abettor, however, the district judge formulated a requisite standard of culpability—actual knowledge of the improper scheme plus an intent to further that scheme—which we find to be a sharp and unjustified departure from the negligence standard which we have repeatedly held to be sufficient in the context of enforcement proceedings seeking equitable or prophylactic relief. SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1096 (2d Cir. 1972); Hanly v. SEC, 415 F.2d 589, 596 (2d Cir. 1969); SEC v. Texas Gulf Sulfur Co., 401 F.2d 833, 854–855 (2d Cir. 1968) (en banc), cert. denied, sub nom. Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). *Cf.* Lanza v. Drexel, 479 F.2d 1277, 1304 (2d Cir. 1973) (en banc).[12]

We do not believe, moreover, that imposition of a negligence standard with respect to the conduct of a secondary participant is overly strict, at least in the context of this case. The legal pro-

---

8. We agree with Judge Tenney that whether there were two meetings at Gardner's office, as Schiffman contends, or only one, as Gardner recalls, is not material to the issue before us.

9. According to Schiffman's reply affidavit, the SEC has filed four complaints against Gardner for various violations of the securities laws and, in at least one of these actions, Gardner has consented to the issuance of a permanent injunction enjoining Gardner and Gardner Securities from further violations.

10. Although the SEC has alleged that Marder actually used Schiffman's opinion letter in the sale of unregistered Spectrum stock, proof of such use must await the evidentiary hearing.

11. The term "underwriter" has been broadly defined to include anyone who directly or indirectly participates in a distribution of securities from an "issuer" (Marder) to the public. SEC v. North American Research & Development Corp., 424 F.2d 63, 72 (2d Cir. 1970). Because the record is unclear, we decline to decide whether the extent of Schiffman's alleged participation in the scheme would be sufficient to qualify him as an "underwriter."

12. Although we have enunciated the negligence test principally in cases involving the anti-fraud provisions of the securities laws, the registration requirement embodied in Section 5 is designed to perform the identical function of protecting investors "by promoting full disclosure of information thought necessary to informed investment decisions." SEC v. Ralston Purina Co., 346 U.S. 119, 124, 73 S.Ct. 981, 984, 97 L.Ed. 1494 (1953). Accordingly, we believe that, in a proceeding by the SEC seeking prophylactic relief, we would be undermining this salutary mechanism by an overly fine appraisal of conduct which contributes to its circumvention.

fession plays a unique and pivotal role in the effective implementation of the securities laws. Questions of compliance with the intricate provisions of these statutes are ever present and the smooth functioning of the securities markets will be seriously disturbed if the public cannot rely on the expertise proffered by an attorney when he renders an opinion on such matters. Schiffman, himself, realized that his opinion letter of December 4 could be used in due course to sell unregistered securities and sought to prevent that use by his subsequent letter to Doyen of December 8. This belated effort was ineffectual, however, since the limitation expressed in the second letter could hardly affect the potency of the December 4 opinion letter which remained unrestricted on its face.

■ We do not find persuasive the argument by one recent commentator that since "the alleged aider and abettor will merely be engaging in customary business activities, such as loaning money, managing a corporation, preparing financial statements, distributing press releases, completing brokerage transactions, or giving legal advice, [a requirement that he] investigate the ultimate activities of the party whom he is assisting [may impose] a burden . . . upon business activities that is too great." Ruder, Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification and Contribution, 120 U.Pa.L.Rev. 597, 632–633 (1972). In the distribution of unregistered securities, the preparation of an opinion letter is too essential and the reliance of the public too high to permit due diligence to be cast aside in the name of convenience. The public trust demands more of its legal advisers than "customary" activities which prove to be careless. And,

to be sure, where expediency precludes thorough investigation, an attorney can prevent the illicit use of his opinion letter by prohibiting its utilization in the sale of unregistered securities by a statement to that effect clearly appearing on the face of the letter.

■ Nor does Professor Ruder's analogy to the strict scienter requirement for *criminal* liability of an aider and abettor seem appropriate to gauge the quality of conduct sufficient to warrant injunctive relief in a civil action. *Cf.* United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938). The disparate consequences cannot be glossed over when striking the balance between private rights and the public interest.

We could not conclude without emphasizing that the standard of culpability we find appropriate for the author of an opinion letter in an action for injunctive relief only should not be construed to apply to more peripheral participants in an illicit scheme or, for that matter, to criminal prosecutions or private suits for damages. Those questions are not before us.

■ Nor do we suggest that the degree of scienter may not be highly relevant to a determination of whether the defendant has the propensity to commit future violations, a requisite to injunctive relief. In this regard, the SEC has indicated on this appeal that, subsequent to the argument of the instant case in the district court, Schiffman has been enjoined for violations of the securities laws on two separate occasions[13] and has pleaded guilty to a third such violation.[14] On remand of this case, we can see no reason for precluding the SEC from introducing this evidence on the propensity issue.

For the reasons stated, the order of the district court is reversed and the

---

13. *See* SEC v. Kelly, Andrews & Bradley, Inc., 341 F.Supp. 1201 (S.D.N.Y.1972); SEC v. D'Onofrio, 72 Civ. 3507 (default judgment entered December 11, 1972).

14. *See* United States v. Akiyoshi Yamada, 72 Crim. 363 (guilty plea entered April 3, 1973).

case remanded for further proceedings. In light of the untoward delay, we strongly urge that the hearing on the application for a preliminary injunction be consolidated with the trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2), and the case advanced for disposition.[15]

15. We do not intend by this opinion to indicate any view on the ultimate decision on the merits.