**SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff,**

v.

**NATIONAL STUDENT MARKETING
CORPORATION et al.,
Defendants.**

Civ. A. No. 225-72, M.D.L. No. 105.

United States District Court,
District of Columbia.

Oct. 21, 1975.

Theodore Sonde, S.E.C., Washington, D. C., for plaintiff.

Brian C. Elmer, Peter B. Work, Jones, Day, Reavis & Pogue, Washington, D. C., for defendant Robert A. Katz.

## MEMORANDUM OPINION

PARKER, District Judge.

This matter concerns the legal responsibility and obligation of an attorney engaged in corporate and securities practice and his liability under the federal securities laws. The Securities and Exchange Commission (Commission or SEC) charges that the defendant Robert A. Katz, an attorney, violated and aided and abetted in the violation of the anti-fraud[1] and reporting[2] sections of the federal securities laws by issuing legal opinions which he knew or should have known were materially false and misleading and which would be relied upon

---

1. § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) ; § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5.

2. § 13(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(a).

by third parties. Permanent sanctions are sought by the Commission restraining and enjoining him from engaging in acts or practices which operate as a fraud or deceit upon other persons and employing devices or schemes to defraud.

In an Amended Complaint detailing an involved securities fraud scheme the Commission alleges in four claims that certain officers, directors, accountants and legal advisors of the National Student Marketing Corporation (NSMC)[3] and others were parties to a series of transactions involving the preparation and dissemination of false and misleading financial statements which artificially inflated the price of NSMC stock. The defendant is named only in the Fourth Claim which charges that he aided and abetted in the issuance of such financial statements by rendering two legal opinions which falsely represented the sale to his clients of Compujob, Inc. (Compujob), a subsidiary of NSMC, when in fact a bona fide purchase and sale had not taken place. The complaint recites that Katz's opinions were used and relied upon by the accountants Peat, Marwick, Mitchell & Co. (PMM)[4] in the preparation for NSMC of materially false and misleading financial statements, a violation of the securities laws. The Commission contends that Compujob had not in fact been sold and that relevant documents were backdated in order that a profit would be reflected in NSMC's annual financial reports.

The parties have filed motions for summary judgment. Katz asserts that the record developed at this point, including relevant documents, depositions and affidavits, clearly shows that there is no genuine factual issue and that there is no legal justification for the Commission's application for injunctive relief against him. In its cross-motion for summary judgment the SEC asserts that the undisputed material facts form a solid basis for the defendant's liability and that the requested sanctions are clearly warranted. After considering the parties' memoranda of points and authorities, the exhibits, affidavits and transcripts of testimony before the Commission, and the oral argument of counsel, this Court concludes that the defendant's motion for summary judgment and the plaintiff's cross-motion for summary judgment should both be denied.

I

## THE FACTUAL BACKGROUND

The material factual details which form the basis of the Fourth Claim are free of any significant dispute. Compujob was organized in late 1967 by Tanfield C. Miller and Edward Swan, Jr. while they were graduate business school students. The company was to furnish to potential employers, for a fee, computer printouts of student resumes. In August 1968 the two enterprising students sought and secured financial backing for their venture from National Student Marketing. An agreement was then finalized and their company was sold to NSMC for 2,000 shares of NSMC stock and a right to share in Compujob's earnings for the subsequent five years.[5] Miller and Swan also became employees of NSMC, concerned principally with the promotion and development of Compujob. This employment was soon terminated when in January 1969, they formed a resort development company based in the Virgin Islands, Strider Oceanic, Inc. (Strider). Their attention and efforts were then directed to this newly formed venture.

---

3. A Judgment of Permanent Injunction was entered against NSMC on July 27, 1972, pursuant to an agreement of the parties.

4. A Judgment of Permanent Injunction was entered against PMM on July 2, 1975, pursuant to an agreement of the parties.

5. This arrangement was subsequently amended to include the earnings of National Manpower Register, Inc., another NSMC subsidiary, with a business similar to that of Compujob, in the base out of which Miller and Swan were entitled to a percentage of earnings.

Compujob proved to be a disappointment to NSMC and in late October 1969, approximately one year after its acquisition, NSMC's Executive Committee authorized the sale of Compujob and of a second problem subsidiary, Collegiate Advertising, Ltd. (CAL), a Canadian corporation. These subsidiaries had incurred substantial losses and represented a significant cash drain for the fiscal year ending August 31, 1969. This together with other factors would cause NSMC's earnings to be well below the level which they had publicly projected and predicted. Confronted with this problem, NSMC officials contacted Miller and Swan regarding the possibility of selling Compujob back to them. The declared objective was to dispose of Compujob so as to remove or offset its losses from NSMC's soon-to-be-released 1969 financial statements. It was at this point that Miller and Swan, well aware of NSMC's predicament, retained the defendant, with whom they had had prior but limited dealings, to represent their legal interests in the purchase negotiations. In an October 24, 1969 memorandum to Katz, Miller noted: "[NSMC's] failure to meet their estimated earnings will damage their reputation in Wall Street . . . . They want the deal badly . . . . They need the earnings; they will agree to reach the swiftest possible agreement."

During November of 1969, the terms of the Compujob transaction were negotiated between Katz, on behalf of his clients and John G. Davies,[6] who represented NSMC. Katz requested that his fee for the services rendered to Miller & Swan be paid by NSMC as part of the transaction. This was acceptable to NSMC. His services included the drafting of several basic documents: a sales agreement, a collateralized promissory note, a management agreement and a letter agreement. With the exception of the letter agreement, all of the documents were backdated to late August

1969. The Purchase and Sale Agreement was "made as of August 27, 1969." By its terms Miller and Swan purchased all outstanding shares of Compujob in return for their collateralized promissory note of $225,000. The note dated August 29, 1969, excluded their personal liability and was without recourse. The collateral supplied to secure the note, 4500 shares of NSMC stock, was furnished by Cortes W. Randell, NSMC's president. In turn, Randell received from Miller and Swan 25 percent of the outstanding stock of Strider. Randell had little, if any, hard facts or knowledge as to the true worth of the Strider stock. He had not seen any financial statements and had no knowledge of any of its financing commitments or land purchase contracts. The recently formed company had no history of operations upon which any informed judgment could be based.

As previously noted, in 1968 when Miller and Swan originally sold Compujob in exchange for NSMC stock they were also entitled to a fraction of Compujob's profits over a period of five years (pay-out agreement). In the resale of Compujob back to Miller and Swan, the previous pay-out agreement was terminated in exchange for 4000 shares of NSMC stock issued to them. However, at the time of the termination agreement Compujob had not accumulated any earnings, and thus Miller and Swan were not entitled to any payments under this provision for fiscal 1969.

In their October 24, 1969 memorandum, Katz's clients indicated that if Compujob was acquired they had no desire to accept any management responsibility and that it should be contracted out. Accordingly, the separate Management Agreement drafted by Katz obligated NSMC to manage Compujob for fourteen months—from September 1, 1969 to October 31, 1970. For that period NSMC was to provide all required working capital and was to be reim-

---

6. Davies, one of the defendants in this suit, was the general counsel of NSMC, and also a director and officer of the corporation.

bursed for such advances and receive compensation for management services from Compujob's net profits, if any. However, payments to NSMC were restricted to only 60 percent of such profits. Further, a subsequent letter agreement provided that Miller and Swan would terminate Compujob's operations at any time during the fourteen month period upon request by NSMC. All expenses associated with such a decision would be paid by NSMC.

The letter agreement was the only document drafted by Katz which bore a true contemporaneous date, November 19, 1969. By its terms NSMC: (1) agreed to undertake promptly a private placement of the 4500 shares of its stock supplied as collateral and to apply the proceeds to pay any income taxes incurred by Miller and Swan in connection with their receipt of those shares from Randell, to pay the franchise taxes of Strider from the date of its incorporation, to apply the balance against the Miller-Swan $225,000 collateralized nonrecourse promissory note, and; (2) promised to indemnify Miller and Swan and hold them free and harmless from any loss or damage incurred in connection with their agreement for the sale of Strider stock to Randell.

### Katz's Legal Opinions

The legality of the backdating of the Compujob transaction was the subject of two opinion letters prepared by Robert Katz at the request of Davies, NSMC's general counsel. The opinions were prepared at the instigation of Peat, Marwick, Mitchell & Co., NSMC's outside auditors, who, as Katz was told, had to approve any agreement for the sale of Compujob, especially with regard to the August 1969 effective date. Although PMM had specifically requested an opinion by White & Case, Davies requested an opinion from Katz, as counsel for the purchasers of Compujob. Katz prepared one opinion, dated November 19, 1975, which stated in pertinent part:

3. As of August 29, 1969, the date of the Closing specified in the Agreement, title to all of the issued and outstanding capital stock of [Compujob] and all of the risks and benefits of ownership thereof passed to the Purchasers.

On November 26, 1969, Katz issued a second opinion to NSMC elaborating on his earlier conclusions:

Notwithstanding that the Closing of the Agreement took place subsequent to August 29, 1969, the parties explicitly intended that it be effective as of said date. I am of the opinion that, under the laws of the state of New York, where the Agreement was made and performed, title to all of the issued and outstanding capital stock of Compujob, Inc. and all of the risks and benefits of ownership thereof passed to the purchasers as of August 29, 1969, the date when the parties intended they should so pass.

Katz's first opinion provided the basis for a letter from White & Case to NSMC on November 20:

We have reviewed an opinion dated November 19, 1969 of Robert A. Katz, Esq. addressed to National Student Marketing Corporation relating to a transaction between National Student Marketing Corporation and Tanfield C. Miller and Edward M. Swan, Jr. and have reviewed the Agreement referred to in such opinion. We concur in the conclusion set forth in paragraph 3 of such opinion and we believe that you are entitled to rely upon such opinion.

PMM deferred to the opinion of counsel in preparing the August 31, 1969 financial statements of NSMC relating to the profit gained from the Compujob sale:

In the opinion of counsel . . . ., negotiations and agreements of sale were in effect consummated prior to August 31, 1969, and title to the stock and all of the risks and benefits of

ownership thereof passed to the purchasers on August 29, 1969.[7]

The financial statements were included in NSMC's annual report to shareholders, disseminated to the investing public, and formed a part of NSMC's 10K report filed with the SEC for the year ending August 31, 1969.

While the footnote stated that the consideration was a "one-year 5% personal note" for $225,000, "secured by 4,500 shares of the company's stock" it did not note the arrangements for NSMC to continue the management and financing of Compujob, the fact that NSMC's president had personally furnished the buyers with the collateral, or the fact that the buyers had been paid 4,000 shares of NSMC to terminate the previous 1968 payout agreement.

## II

### KATZ'S MOTION FOR SUMMARY JUDGMENT

Katz's motion for summary judgment asserts that on the basis of undisputed facts, the inevitable conclusion of law is that there is no legal justification for the granting of permanent injunctive relief against him. The Court disagrees and the defendant's motion is denied. A review of all the evidence presented and a consideration of the points and authorities leaves little doubt that Katz knowingly aided and abetted a violation of the federal securities laws.

The thrust of the defendant's argument is that his participation in the Compujob matter was limited to the preparation of a legal opinion on a narrow question, and that because of his peripheral role and because his knowledge or awareness of any scheme to mislead investors and others was so slight, if any, that as a matter of law, he could not be deemed liable for aiding and abetting a securities fraud. He argues that even if there was a primary violation (namely, a materially misleading characterization of the Compujob transaction in the 1969 financial statements of NSMC), he could not be held liable because of the limited extent of his involvement, and his unawareness of any wrongdoing on the part of the principals.

For the purposes of dealing with the defendant's motion, the Court will assume that a primary violation has been established, and concludes that the motion should be denied because the evidence clearly shows substantially more than a marginal involvement and limited knowledge by this attorney. If later, it is established that there was no primary violation of the securities laws, then Katz, as well as the principal participants charged, will be entitled to judgment in their favor.

*Were Katz's Opinion Letters Correct?*

Central to Katz's argument is that his two opinion letters on the "simple legal question" of when title to the Compujob shares passed under New York law were technically correct. To support this proposition, he cites case authority which hold that it is "fundamental" that parties to a contract can agree to make it effective as of an earlier date and that the parties will be bound thereby. *E. g., Matthews v. Jeremiah Burns, Inc.,* 205 Misc. 1006, 129 N.Y.S.2d 841 (Sup. Ct.1954). He further argues that his conclusion that "all of the risks and benefits of ownership" of Compujob had passed to Miller and Swan was likewise correct because the transaction represented a valid sale which was binding on the parties under New York law. He points to provisions of the New York Uniform Commercial Code to the effect that a sale "consists in the passing of title from the seller to the buyer" (N. Y. Uniform Commercial Code § 2–106(1)), and that title passes when the goods are

---

7. Anthony Natelli, a PMM partner and one of the defendants in the present suit, explained that the Katz and White & Case opinions "were received as a result of [PMM's] request . . . " Testimony of Anthony Natelli before the Securities and Exchange Commission on June 1, 1971, at pages 275–76.

physically delivered or at any other time explicitly agreed upon by the parties. (N. Y. Uniform Commercial Code § 2–401(2)).

■ Katz's arguments concerning the passage of title, however, ignore the overall factual picture which should have been readily apparent to him. He drafted the several documents described above which constituted the entire Compujob transaction. The Commission contends that the alleged sale, reported in the 1969 financials of NSMC, was actually a sham because of the underlying agreements which accompanied the "sale". Although technically title to the shares of stock may have been transferred, the economic substance of the transaction did not transfer any of "the risks and benefits of ownership" to the purchasers Miller and Swan. Under the agreements drafted by Katz, the right to manage Compujob remained with NSMC; the obligation to provide operating capital remained with NSMC; and the right to terminate operations remained with NSMC. Miller and Swan assumed no obligations: they were not personally liable on the promissory note; the collateral on the note was not supplied from their resources but was provided by Randell, NSMC's president;[8] any income tax liability arising out of the transaction was assumed by NSMC; and Miller and Swan were also indemnified by NSMC for any loss arising out of the exchange of Strider for NSMC stock. Not only were Miller and Swan free of any detriment in exchange for their purchase of Compujob, they actually received a substantial benefit by negotiating the termination of their prior pay-out agreement, the value of which was highly speculative, in exchange for

an additional 4,000 shares of NSMC stock. After a permanent injunction was entered by consent against NSMC in this case, the financials were amended to reflect a substantial *loss* by NSMC due to the *abandonment* of Compujob, rather than a gain from its sale as originally set forth.[9]

■ Katz counters the SEC's charge of a sham sale by arguing that economic reality is a matter for the accountants, and that as a lawyer, he was only obliged to look at the formal aspects of the transaction.[10] The Court is unwilling to accept and rejects such an argument. Lawyers are not free to ignore the commercial substance of a transaction which could obviously be misleading to stockholders and the investing public. Courts have not hesitated to pierce through legalistic form in order to circumvent violation of the securities law. Recently, the Seventh Circuit in order to enforce the prohibition against insider sales of stock within six months of acquisition,[11] treated a stock option arrangement as a sale:

> [T]ransactions subject to speculative abuses deserve careful scrutiny. The insider should not be permitted to speculate with impunity merely by varying the paper form of his transactions. The commercial substance of the transaction rather than its form must be considered, and courts should guard against sham transactions by which an insider disguises the effective transfer of stock. *Bershad v. McDonough*, 428 F.2d 693, 697 (7th Cir. 1970), *cert. denied* 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971).

Katz also argues that the management and termination agreements did not detract from the legal passage of title of

---

8. Katz himself described the exchange of Miller and Swan's Strider shares for Randell's 4500 NSMC shares as a contribution by Randell to the capital of NSMC. Katz deposition before the SEC, December 21, 1975, at 53 (hereafter Katz deposition).

9. See Report prepared pursuant to the Judgment of Permanent Injunction against

NSMC, *supra* n. 3, prepared by Touche Ross & Co., at 51–52 (hereafter Touche Ross Report).

10. *Id.* at 50–51.

11. Securities Exchange Act of 1934, § 16(b), 15 U.S.C. § 78p(b).

the stock of Compujob to Miller and Swan. He cites New York cases to the effect that management of property by another does not vitiate the title held by the owner. *E. g., Lowery v. Erskine,* 113 N.Y. 52, 20 N.E. 588 (1889). As to the argument that Miller and Swan paid no consideration to obtain title to Compujob, because they only parted with 25 shares of Strider, which had no established market value, Katz relies again on New York law to the effect that even the slightest consideration can create a binding obligation. *E. g., Mencher v. Weiss,* 306 N.Y. 1, 114 N.E.2d 177 (1953). Of the several cases cited by Katz, however, none dealt with a transaction with the Compujob adornments which transferred bare title in order to create the false impression with the investing public that a company had more assets than it actually had. Moreover, the Commission is not contending that NSMC did not make a valid and binding contract with Miller and Swan—the real issue is whether the terms of that transaction were such that the public would be misled about NSMC's financial position.

Thus, this Court rejects the proposition that a member of the bar can seek refuge behind a legal technicality, elevating form over substance, when he is a party to and fully familiar with the circumstances which indicate that an illusory transaction is being undertaken which could be utilized to mislead third parties. Katz's focus on the narrow legal questions on which he opined is unrealistic in view of his participation in the total transaction which obviously had the possibility for misleading outsiders.

### Did Katz Aid and Abet a Violation of the Securities Laws?

■ There are three prerequisites to a finding that one has aided and abetted a securities law violation: (1) a primary violation has occurred; (2) knowledge of or a duty of inquiry with regard to the primary violation by the person charged; and (3) a necessary contribution to the underlying scheme by the person charged.[12]

The Court assumes for the purpose of deciding this motion that a primary violation has been established, based on the false and misleading characterization of the Compujob abandonment as a sale which resulted in a gain to NSMC in fiscal 1969, as discussed above. As to the second factor, there is some conflict in the case law as to whether an aider and abettor must have actual knowledge of the primary violation or whether he may be guilty of aiding and abetting through mere negligence, i. e., a failure to make reasonable inquiries.

The traditional view, relied upon by Katz, is that one acting solely as an attorney will not be held in violation of the securities laws as an aider and abettor unless he had actual knowledge or acted in willful or reckless disregard of a fraudulent scheme in which he played an essential role. *See SEC v. Frank,* 388 F.2d 486 (2d Cir. 1968). In a more recent case, the Sixth Circuit held that a person may be liable as a securities fraud aider and abettor only if "the accused party had general awareness that his role was part of an overall activity that is improper." *SEC v. Coffey,* 493 F.2d 1304, 1316 (6th Cir. 1974), *cert. denied* 420 U.S. 908, 95 S.Ct. 826, 42 L. Ed.2d 837 (1975).[13]

12. *See: SEC v. Coffey,* 493 F.2d 1304, 1316 (6th Cir. 1974) *cert. denied* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975). *See also: Brennan v. Midwestern United Life Insurance Co.,* 259 F.Supp. 673 (N.D.Ind.1966), 286 F.Supp. 702 (N.D.Ind.1968), *aff'd* 417 F.2d 147 (7th Cir. 1969), *cert. denied* 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970).

13. Some commentators have also strongly supported the "actual knowledge" standard for aiding and abetting. *See:* Mathews, "Liabilities of Lawyers under the Federal Securities Laws", 30 *Bus.Lawyer* 105 (1975); and Ruder, "Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, *In Pari Delicto,* Indemnification and Contribution," 120 *U.Pa.L.Rev.* 597, 620–44 (1972).

Both the Second and Seventh Circuits have shown a willingness to characterize professionals as aiders and abettors for simple negligence, i. e., failure to perform a duty of inquiry, rather than requiring a showing of knowing participation or recklessness.[14] The Ninth Circuit has rejected both the actual knowledge ("scienter") and the negligence standards, and has substituted the "flexible duty" standard in securities fraud cases, under which the factfinder must examine the circumstances of each case in order to determine the defendant's duty. *White v. Abrams*, 495 F.2d 724 (9th Cir. 1974).

■ This Court need not reach the issue of which is the correct standard for assessing the activities of aiders and abettors of securities frauds, however, because it can be inferred from the factual circumstances of this case that Katz either knew that NSMC planned to issue a false financial statement, or he ignored what should have been evident to him as a lawyer with some expertise in corporate mergers and acquisitions.[15]

In Katz's pleadings and at oral argument, he is portrayed as a professional who had only minimal contacts with the principal participants in the alleged fraud; that he issued a narrow legal opinion which was technically correct, and was completely relying upon the independent auditors to ensure that the transaction was properly accounted for in the financial statements. The *defendant's position as an outsider is* similar to that of the attorney in the *Spectrum* case, *supra* n. 14, who was contacted by a stockbroker for whom he issued two opinion letters on the marketa-

bility of unregistered shares. The Second Circuit held that an attorney, even an outsider who makes no profit other than his ordinary fee, will be enjoined if he negligently issued an opinion which ultimately is deemed false and misleading to the investing public. In another case, an attorney who prepared a misleading opinion letter was enjoined because his statements "went beyond mere mistakes in legal judgment." *SEC v. Century Investment Transfer Corp.*, CCH Fed.Sec. L.Rep. ¶ 93,232 (S.D.N.Y.1971).

Thus, there is ample precedent for regarding an attorney as an aider and abettor based upon the issuance of a false and misleading opinion letter. The defendant's assertion that he had no idea that the Compujob transaction would be fraudulently accounted for is belied by his intimate acquaintance with the entire transaction which revealed a transparent attempt to make it appear that Compujob had been sold for value in fiscal 1969 whereas in actuality, Miller and Swan had been paid to take a disappointing subsidiary off the hands of the parent corporation, as a result of negotiations which occurred months after the close of the fiscal year.

■ Katz, with knowledge that the auditors were relying on the opinion of counsel,[16] stated that all "risks and benefits of ownership" had passed to Miller and Swan as of the end of fiscal 1969, whereas he knew, from having drafted the documents, that the "sale" of Compujob had no real substance and that any reported gain would falsely enhance the financial posture of NSMC. The fact that PMM may also have violated the securities laws in the course of

---

14. *See: Hochfelder v. Ernst & Ernst*, 503 F.2d 1100 (7th Cir. 1974), *cert. granted* 421 U.S. 909, 95 S.Ct. 1557, 43 L.Ed.2d 773 (1975) (accountants charged in private damage suit with aiding and abetting a securities fraud by negligent auditing) ; *SEC v. Dolnick*, 501 F.2d 1279, 1284 (7th Cir. 1974) (specifically rejects standard of *SEC v. Coffey*, supra, relied on by Katz) ; *SEC v. Spectrum, Ltd.*, 489 F.2d 535 (2d Cir. 1973) (attorney charged with aiding and abetting

securities fraud should be enjoined if he was negligent, even without actual knowledge of the improper scheme) ; *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808–09 (2d Cir. 1975) (injunctive relief should be granted against lawyer who was "careless" in advising that unregistered shares could be issued without restrictive legend).

15. Katz deposition at 9.

16. *Id.* at 46.

drafting the financial statements does not relieve the defendant of all responsibility. He cannot credibly claim that he was unaware that NSMC was planning to mislead investors when at the very outset of the negotiations, he had in hand an analysis of the situation, furnished him by his clients in their October 24 memorandum. Thus, Katz either actually knew that a fraudulent scheme was envisioned by NSMC, or else he recklessly ignored what should have been readily apparent.[17]

■ The third element of aiding and abetting, i. e., that Katz made a necessary contribution to the principal violation, has clearly been met. Although he was not an insider in the sense of personally profiting from the scheme, he was a central participant in negotiating and drafting the Compujob transaction. He also knew that PMM was relying on counsel's opinion in order to account for the transaction as a gain in fiscal 1969.

Thus, contrary to Katz's assertions, the SEC has made out a substantial case against him as an aider and abettor to a securities fraud scheme. Based on the Court's evaluation of the evidence thus far presented, Katz's motion for summary judgment should be denied.

## III

## THE COMMISSION'S CROSS-MOTION FOR SUMMARY JUDGMENT

The Commission has marshalled a strong case against defendant Katz with regard to the Fourth Claim of the Amended Complaint. Nonetheless, the Court is of the opinion that it is inappropriate at this stage of the National Student Marketing litigation to grant the Commission's cross-motion for summary judgment and injunctive relief against Katz. Seven other defendants including White & Case and a member of that firm who were also involved in the Compujob transaction, are still vigorously pursuing their defenses.[18]

■ One of the purposes of the summary judgment procedure is to conserve judicial resources by avoiding unnecessary trials. Granting summary judgment against Katz at this time, however, would not appear to serve this purpose because the same factual and legal issues will be presented by the parties who are not involved in the immediate motions. Additional matters relating to the Compujob transaction may be developed through discovery, which is and has been under way, or evidence might be presented by the other participants which could throw a different light on the role played by Katz and the other defendants.

To grant an injunction against Katz, who was only one of several participants in the Compujob scheme, would constitute piecemeal adjudication which is inappropriate.

There is a dearth of authority for civilly enjoining a defendant on summary judgment in a securities fraud case. The Commission has cited only one case where an injunction was granted in an enforcement proceeding on the basis of documentary evidence alone.[19] Furthermore, other courts have strongly recommended an evidentiary hearing in cases

---

17. *See United States v. Sarantos*, 455 F.2d 877 (2d Cir. 1972) where an attorney was convicted for aiding and abetting a scheme to evade the immigration laws by the use of sham marriages between aliens and U.S. citizens. The court stated that an attorney cannot circumvent criminal sanctions "by deliberately closing his eyes to the obvious risk that he is engaging in unlawful conduct." *Id.* at 881. Even the *Frank* case, *supra*, relied upon by Katz, stated that "a lawyer, no more than others, can escape liability for fraud by closing his eyes to what he saw and could readily understand." 388 F.2d at 489.

18. The remaining defendants charged in the Fourth Claim are Randell, Davies, Kurek, Walther, Fergusson, White & Case, Epley and Natelli.

19. *SEC v. Geyser Mineral Corp.*, 452 F.2d 876 (10th Cir. 1971). This case involved a principal, not an aider and abettor.

where although there is little dispute as to the raw facts, the parties are absolutely at odds as to the inferences to be drawn from them and as to the applicability of the governing securities fraud statutes.[20] This Court agrees with Judge Friendly of the Second Circuit that where

> issuance of an injunction on the ground of fraud turns on the knowledge and intent of an individual during a short period of time, [there is] no basis for dispensing with the evidentiary hearing normally required simply because the plaintiff is a government agency [i. e., the SEC].[21]

In addition to the above reasons, summary judgment should be denied at this time because some relevant factual issues remain in dispute. As previously noted, for Katz to be liable as an aider and abettor, the Commission must first establish the existence of a primary violation. This matter will certainly be more fully developed and the Court should defer decision in this matter to avail itself of further amplification that might result.

The element of the materiality of the violation, i. e., whether the correct accounting of the Compujob transaction is a "matter as to which an average prudent investor ought reasonably to be informed before purchasing the security registered," [22] has not been clearly established. In *Escott v. Barchris Constr. Corp.*, 283 F.Supp. 643 (S.D.N.Y.1968), a corporation overstated its net operating income by 16.5%, and erroneously stated its earnings as 75 cents per share, rather than the correct figure of 65 cents per share. Those misstatements were not found to be material in light of the speculative nature of Barchris' securities and the fact that the company's earnings increased significantly even without the overstatements. Here, the reported Compujob gain was less than 10% of NSMC's 1969 earnings.[23] As Judge McLean noted in *Barchris* the materiality of an overstatement of income is "a question of judgment, to be exercised by the trier of the fact as best he can in the light of all the circumstances." [24] Since the materiality of the Compujob misstatement is still in dispute, it is not an appropriate matter for summary judgment.

If the SEC's cross-motion was granted, in addition to determining that Katz had aided and abetted a securities fraud, the Court would also have to consider the propriety of issuing an injunction. The ultimate question then presented is whether defendant's past conduct indicates that there is a reasonable likelihood that the wrong will be repeated.[25] Neither the voluntary discontinuance of the unlawful activity,[26] nor a declaration of intention to comply with the law in the future [27] will preclude an injunction.

---

**20.** *SEC v. Frank, supra*, 388 F.2d at 490.

**21.** *Id.* at 492. *Accord: SEC v. Management Dynamics, Inc., supra* n. 14. *See also: SEC v. Spectrum Ltd., supra*, 489 F.2d at 541, where in the context of a case where facts relating to the attorney-defendant's knowledge of the fraudulent scheme were the subject of conflicting affidavits, Chief Judge Kaufman stated:

> [S]ince oral testimony is a medium far superior for evaluating credibility than the cold written word, we consider an evidentiary hearing essential to the proper disposition of this case.

**22.** 17 C.F.R. § 230.405(e).

**23.** Memorandum of SEC, filed August 12, 1975, at 24.

**24.** *Barchris, supra*, 283 F.Supp. at 682. *Cf. SEC v. Shapiro*, 494 F.2d 1301, 1306 (2d Cir. 1974) where the court held that the "materiality" of insider information "must be determined on a case-to-case basis according to the fact pattern of each specific transaction."

**25.** *See* III Loss, *Securities Regulation*, Chap. 12G at 1976 (1961).

**26.** *SEC v. Management Dynamics, Inc., supra* n. 14, 515 F.2d at 807.

**27.** Affidavit of Robert A. Katz, attached to "Reply of Robert A. Katz to the SEC's Op-

The Court must evaluate the sincerity of the defendant's assurances that he will not again transgress.[28] The fact that the defendant maintains his innocence is a factor pointing to the need for an injunction.[29] On the other hand, the detrimental consequences that may flow to an attorney as a result of an injunction,[30] and his subjective good faith in relying on the state of the law as he then perceived it,[31] are factors which militate against the grant of injunctive relief. The fact that Katz's participation in the Compujob matter took place in 1969, at the early stages of a recent judicial trend expanding the liabilities of securities lawyers,[32] may also assist this defendant. Many of the factual issues relating to injunctive relief are the subject of disagreement between the parties and therefore should not be resolved on summary judgment. These factors involve an inquiry into the defendant's state of mind at the time of the violation and his intentions for the future. This Court is of the opinion that these matters should properly be the subject of further inquiry.

Accordingly, for the reasons stated in the foregoing Memorandum Opinion, it is this 21st day of October, 1975.

Ordered that the defendant's motion for summary judgment be, and it hereby is, denied; and it is further

Ordered that the plaintiff's cross-motion for summary judgment be, and it hereby is, denied.

position to Katz's Motion for Summary Judgment," filed August 22, 1975.

28. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972).

29. *SEC v. First American Bank & Trust Co.*, 481 F.2d 673, 682 (8th Cir. 1973).

30. Mathews, *supra* n. 13 at 106.

31. *SEC v. Harwyn Industries, Inc.*, 326 F. Supp. 943 (S.D.N.Y.1971).

32. Several commentators have called the *National Student Marketing* litigation a turning point in the exposure of attorneys to liability for aiding and abetting the securities fraud schemes of their clients. *See:* Lowenfels, "Expanding · Public Responsibilities of Securities Lawyers: An Analysis of the New Trend in Standard of Care and Priorities of Duties," 74 Colum.L.Rev. 412 (1974); and Freeman, "Opinion Letters and Professionalism," 6 Sec.L.Rev. 101 (1974).