**W. E. FELTS, Gene A. Gist, Clarence Bennett, William Moyle, James F. Park, Sr., Mrs. Lige Brunson, John F. Harper, Judy Harper, J. H. Franklin, Herbert S. Wooley, S. M. Cornwall, Bobby F. Clay, H. Douglas Ivy, Earl J. Winn, Plaintiffs,**

**v.**

**NATIONAL ACCOUNT SYSTEMS ASSOCIATION, INC., Starco Corporation, Jackson Warehousing and Certifying, Inc., Edward J. Peters, Charles J. Steen, Geraldine Steen, James Carroll Fuller, Robert B. Dukes, Jr., L. C. Schmidt, Andrew D. Andrews, the London Guarantee and Accident Company of New York, John Doe(s), Defendants.**

**No. GC 75–151–S.**

United States District Court, N. D. Mississippi, Greenville Division.

Nov. 30, 1978.

Luke M. Dove, Chill, Chill & Dove, Jackson, Miss., for plaintiffs.

Robert H. Taylor, Royals & Taylor, Jackson, Miss., Henderson S. Hall, Jr., Wise, Carter, Child, Steen & Caraway, Jackson, Miss., Fred A. Ross, Jackson, Miss., Tom P. Calhoun, III, Whittington, Brock, Swayze, Dale & Calhoun, Greenwood, Miss., O. Jackson Cook, Atlanta, Ga., Jack A. Travis, Jackson, Miss., L. Carl Hagwood, Campbell & DeLong, Greenville, Miss., for defendants.

## MEMORANDUM OF DECISION

ORMA R. SMITH, District Judge.

This action arises under the Securities Act of 1933, (15 U.S.C. §§ 77a, et seq.) the Securities Exchange Act of 1934, (15 U.S.C. §§ 78a, et seq.) and Rule 10b–5, promulgated thereunder, (17 C.F.R. § 240.10b–5). The jurisdiction of this court is invoked pursuant to the provisions of 15 U.S.C. §§ 77v and 78aa and of 28 U.S.C. § 1337. Plaintiffs also invoke pendent jurisdiction for the adjudication of claims arising under Missis-

sippi's "Blue Sky", Miss. Code Ann. §§ 75–71–1, et seq. (1972), and common law doctrines.

There are multiple plaintiffs and defendants. Prior to trial, the court sustained motions for summary judgment, 446 F.Supp. 357, in favor of the defendants, A. J. Gazaway; Gazaway and Scott; The Travelers Indemnity Co.; and The Travelers Insurance Co., on the basis of principles established in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), and related decisions. During trial, plaintiffs announced a $60,000.00 settlement with the defendants, A. D. Andrews; London Guaranty and Accident Co. of New York; Fidelity and Casualty Co.; and The Continental Insurance Co.

After receiving stipulations of fact, the court conducted a non-jury trial, and, following the submission of legal memoranda, scheduled a hearing at which closing arguments were received. The action was submitted upon the evidence produced and the entire record. Upon completion of the closing arguments, the court rendered a short bench opinion which is incorporated herein by reference. In addition to those contained in the bench opinion aforesaid, the court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) Fed.R.Civ.P.

## FINDINGS OF FACT

1. Each plaintiff is the purchaser of a twelve (12) month maturity promissory note issued, offered, sold and delivered by National Account Systems Association, Inc. (NASA). All notes are in default and are payable with accrued interest. The plaintiffs made the following transactions:

   a. W. E. Felts purchased one $10,000 note on May 24, 1974;

   b. Gene A. Gist purchased one $10,000 note on April 29, 1974;

   c. Clarence Bennett purchased one $40,-000 note on May 11, 1974;

   d. William Moyle purchased one $10,000 note on March 25, 1974; one $5,000 note on March 25, 1974; and one $2,000 note on May 7, 1974;

   e. James F. Park, Sr., purchased one $12,000 note on May 6, 1974;

   f. Mrs. Lige Brunson purchased one $3,600 note on April 1, 1974;

   g. John F. and Judy Harper purchased one $3,000 note on April 9, 1974;

   h. J. H. Franklin purchased one $6,000 note on May 17, 1974, and two $6,000 notes on May 15, 1974;

   i. Herbert S. Wooley purchased one $10,300 note on March 1, 1974;

   j. Bobby F. Clay purchased one $1,000 note on April 26, 1974;

   k. H. Douglas Ivy purchased one $2,000 note on March 1, 1974;

   l. Earl J. Winn purchased one $2,000 note on May 7, 1974;

   m. Mr. and Mrs. Earl Anderson purchased one $2,000 note on May 10, 1974;

   n. Mrs. Lillie M. Sellers purchased one $10,000 note on April 30, 1974;

   o. Joseph F. Francis, Jr., purchased one $5,000 note on May 27, 1974.

2. The defendants are:

   a. National Account Systems Association, Inc., (NASA) incorporated in Mississippi on October 4, 1973, and the issuer of the promissory notes. NASA is a voluntary bankrupt and plaintiffs have obtained leave of the Bankruptcy Court for the prosecution of this action.

   b. Starco Corporation (Starco), a Delaware corporation which began doing business in Mississippi in 1971 or 1972, but which did not qualify until July, 1974. Starco is an involuntary bankrupt and plaintiffs have also obtained leave of court to prosecute this action against Starco.

   c. Jackson Warehousing and Certifying, Inc., (Jackson Warehousing), incorporated in Mississippi on March 6, 1974. A judgment by default will be entered against Jackson Warehousing since no answer was filed on its behalf.

   d. Edward J. Peters (Peters), a lawyer and the elected District Attorney of Hinds and Yazoo Counties, Mississippi. In connection with the issue, offer, sale and delivery of the promissory notes,

Peters was the lawyer for NASA and Starco. In addition, Peters was a director and the "President" of NASA until his resignation on April 29, 1974. Peters was also the lawyer who incorporated Jackson Warehousing.

e. Charles J. Steen, the President of Starco and Vice-President of NASA. At the time of the sale of these notes, Steen had a criminal record which included convictions for mail fraud and Dyer Act violations.

f. Geraldine Steen (Mrs. Steen), the wife of Charles J. Steen. Mrs. Steen was the bookkeeper for Starco and, after April, 1974, the Treasurer of NASA. Shortly prior to the trial of this action, both Steen and Mrs. Steen were convicted of criminal fraud in the Alabama state courts in connection with the operation of National Account *Services* Association, Inc. (NASA of Alabama). These convictions are on appeal.

g. James Carroll Fuller, former sales manager of Starco and "President" of NASA following the resignation of Peters. Fuller was also the Treasurer and an incorporator of Jackson Warehousing.

h. Robert B. Dukes, a former employee of Starco and the "President" of Jackson Warehousing.

3. NASA or its agents utilized instrumentalities of interstate commerce in connection with the offer, sale, and delivery of the promissory notes including television commercials and telephone and mail solicitation. NASA did not file a registration statement for the sale of these notes with the Securities Exchange Commission. Moreover, NASA did not seek registration or exemption under Mississippi law until forced to do so by the Deputy Secretary of State.

4. NASA offered, sold, issued and delivered the promissory notes by means of oral and written representations contained in brochures, offering circulars, "packets" and letters. In a nutshell, the sales scheme can be described as follows:

NASA was represented to be a "factoring" company which purportedly factored the accounts receivable of established manufacturing or retail firms. It was represented that NASA purchased the receivables at a discount from firms which required a better cash flow than permitted by 60 or 90 day receivables. NASA was to have collected the receivables for face value and thus earned a profit. It was also represented that NASA "loaned" funds on the strength of receivables.

Allegedly to raise capital for factoring, NASA offered promissory notes for sale to the public. To make the notes attractive and promote sales, five principal representations were made which will be summarized here:

(a) That NASA was a "factor" as described above;

(b) That NASA would pay a high rate of return on investments (either 12% or 15% per annum);

(c) That all accounts factored or monies loaned by NASA were "fully secured and insured" by proper liens or protected by credit insurance or other insurance;

(d) That the collateral was "certified" by an independent, bonded "collateral certifying company"; and

(e) That Peters was the "President" of NASA.

5. Starco is an acronym for Steen Tire and Rubber Co. which was principally engaged in retail sales and servicing of tires, mufflers and shock absorbers. In 1968, Starco opened a service center in Huntsville, Alabama. In 1971 or 1972, Steen decided to move the Starco warehouse to Jackson, Mississippi. He also decided to purchase an existing tire store and open another service center in Jackson. In 1973, Starco was doing business in both Alabama and Mississippi and in addition, had approximately 50 dealers in eighteen states. The major portion of its business was in interstate commerce.

6. Steen met Peters when Steen moved to Mississippi. Peters was a part-time district attorney who, under Mississippi law,

was permitted to maintain a private civil practice. Starco retained Peters as its lawyer in connection with the purchase of the tire store in Jackson. Peters continued to represent Starco as its lawyer including the period of the sale of these promissory notes. Peters did not know of Steen's criminal past although, as District Attorney, he had access to these records. Peters had little corporate legal experience and no experience with or knowledge of securities law.

7. Starco had apparently been "borrowing" funds from NASA of Alabama, a corporation headquartered in Huntsville which ultimately sold in excess of $4,000,000 of promissory notes to residents of several states.

8. In 1973, Steen retained Peters to organize NASA in Mississippi and to serve as its legal counsel. Peters' legal fees were to have been paid as a percentage of NASA's "profits" from factoring. Steen explained to Peters that NASA would operate on a plan similar to the scheme which was operating successfully in Alabama.

The operation of NASA of Alabama, however, had previously been challenged by state officials and this fact was known to Peters. Therefore, Steen and Peters traveled to Atlanta, Georgia, in 1973, to meet with a lawyer specializing in securities. This lawyer advised Peters orally and in writing that:

(a) The promissory notes to be issued by NASA would constitute securities and must be registered under the 1933 act unless exempt; and

(b) Applicable exemptions could include the intrastate offering exemption, the commercial paper exemption, and the "Regulation A" exemption. The essential features of these exemptions were explained to Peters along with the caveat that, if the exemptions did not apply, full registration would be required. Peters was also cautioned to determine state "Blue Sky" requirements.

9. Steen and Peters elected not to file a registration statement. Steen contends this decision was made because of the expense. However, the Georgia lawyer had advised Steen in 1971 that NASA of Alabama was already in violation of the Securities Act.

10. At the time of incorporation, Steen persuaded Peters to serve as the "President" of NASA. Peters agreed to do so although it was understood that Peters was to be merely a titular president and that actual authority and supervision would remain in the hands of Steen.

At trial, Steen explained that Peters was nominated as President since Steen would have a "conflict" if he were to serve as President of both "lender" (NASA) and the "borrower" (Starco). His criminal record was also a contributing factor. The court finds, therefore, that from the time NASA was organized, Peters clearly knew or should have known that funds raised by NASA from the sale of promissory notes would be diverted directly to Starco and/or Steen.

After agreeing to serve as President, Peters furnished his signature stamp. He instructed Steen to use the stamp only to sign promissory notes and interest checks. However, Peters never attempted to verify how the stamp was actually being utilized. In fact, Peters' signature was also being stamped on promotional material.

11. Following the meeting in Atlanta, Peters decided that the proposed notes were either not securities or were exempt from registration. However, he made no independent inquiry or investigation in his capacity as legal counsel to determine if the notes were, in fact, exempt. Moreover, he completely neglected to determine the compliance requirements of state law. Peters instructed Steen that the notes were to be offered and sold only to residents of Mississippi but made no attempt to see that this was effectuated.

12. In December, 1973, NASA began to advertise the sale of its notes on Jackson television stations. On December 26, 1973, Ben Hawkins, Deputy Secretary of State, wrote to Peters and expressed concern over the use of the term "insured assets" in the television commercials. Hawkins also re-

quested a copy of "all materials used in the operations regarding this offering for investment". On January 8, 1974, Peters replied that the term "insured assets" may have been misleading and expressed a desire to be in "strict compliance". However, Peters still made no effort to determine the registration requirements of Mississippi law.

On January 22, 1974, Hawkins again wrote to Peters and renewed his request of December 26. Peters failed to reply. On January 24, Heber Ladner, Secretary of State, ordered that NASA immediately cease the offer and sale of "investment contracts" and stated that a permanent order would be entered unless NASA complied with state law.

13. On January 28, 1974, Peters, acting as the Lawyer for the issuer, filed an Application for Exemption and supporting exhibits with the Secretary of State. The exhibits included a balance sheet, copies of sample notes, and copies of certain promotional brochures. The application also stated that S.E.C. registration was "not applicable".

However, by January 28, 1974, NASA had already sold promissory notes in the amount of $16,000. At least one note had already been issued to a non-resident of Mississippi. Peters made no effort to determine this fact and, consequently, failed to report it to the Secretary of State or the S.E.C.

14. On February 4, 1974, the Secretary of State granted an exemption to NASA for the sale of promissory notes. The exemption was approved on the basis of the application of exhibits submitted by Peters in his capacity as lawyer for the issuer. During this conference with Mr. Hawkins, Peters acted solely as lawyer for the issuer.

15. Following the approval of the exemption, NASA continued the promotion and sale of promissory notes. Ultimately, NASA sold notes in excess of $340,000. The majority of the notes were sold with the aid of brochures, letters and other written representations which in every case were different from the exhibits submitted with the application for exemption. The majority of the promotional material asserted that these notes were "not securities".

16. All proceeds of the sale of notes received by NASA were transferred to Starco by Steen or Mrs. Steen. During the term of the issue, Starco purchased equipment and constructed service centers in Tupelo, Greenville, Cleveland and Hattiesburg, Mississippi. Each of these service centers were constructed on property leased by Starco.

17. 100% of the "loans" from NASA to its customers were to Starco, which had not qualified to do business in Mississippi. The "loans" were advances on a $400,000 line of credit established by NASA to Starco in August, 1973, before any notes were sold. No security agreements were filed or recorded until NASA was forced to do so by the Deputy Secretary of State, and after all notes were sold. Peters admitted, and the court finds, that the duty to properly record liens belonged to Peters as the lawyer for NASA.

18. Jackson Warehousing purportedly "certified" accounts to NASA from Starco. Jackson Warehousing never issued any stock, had no books and records and had no employees. Its "President" was Robert B. Dukes, who signed all certificates. Dukes was an employee of Starco under the supervision and control of Steen.

19. NASA itself never issued any stock and never had any paid-in capital as required by law. Neither Peters nor Steen paid for any stock and none was issued. NASA was a corporate sham.

20. On April 29, 1974, Peters resigned as "President" of NASA. At the request of Steen, he was replaced by J. C. Fuller who was an employee of Starco under the supervision and control of Steen.

Fuller signed notes, interest checks and promotional material. He also made oral representations to purchasers concerning the nature and status of their investments in NASA.

21. On May 30, 1974, the Secretary of State entered an order of prohibition direct-

ing that NASA immediately cease the offer, sale, advertisement, issue and delivery of its promissory notes. In addition, the certificate of exemption was suspended. In connection with the order, the Secretary of State found, inter alia:

(a) That investments were not "fully" secured and protected as advertised.

(b) That the use of the phrase "registered factoring company" was designed to infer governmental supervision or approval.

(c) That all phases of the NASA program were not insured by the Continental Insurance Co. as advertised.

(d) That the loans were not secured by good collateral.

(e) That the policy of credit insurance did not provide the coverage advertised.

(f) That first liens were not obtained.

This court hereby adopts the factual findings of the Secretary of State.

Following the order of prohibition, Fuller wrote the plaintiffs at the request of Steen to advise that the order would be contested or appealed. However, there was no contest and a permanent order was entered on June 12, 1974, which revoked the certification of exemption, ordered that NASA redeem the notes, that Starco indemnify NASA to the extent of the notes sold, that Starco qualify to do business in Mississippi and subordinate its assets to NASA, and that a special bank account be established to repay the noteholders.

23. This action was too little and too late. Starco had never made a profit. Its expansion program was financed by the noteholders through NASA. Although Fuller continued to make interest payments on behalf of NASA, the interest was being paid out of the principal of the investments.

24. At the request of Steen or Fuller, lawyers representing NASA repeatedly contacted the plaintiffs and other noteholders by letter or telephone to advise that NASA was in the process of liquidating assets or real estate so that the notes could be paid as soon as possible. These contacts continued through at least June 20, 1975. The court finds that these contacts, initiated at the request of the issuer, induced the plaintiffs to delay filing suit until late 1975.

25. No liens or security interests were perfected until after May 31, 1974. Of the $334,058 in "loans" to Starco, $4,140 were secured by accounts receivable, $36,334 were secured by inventory and the equipment. The only "security" on the remainder consisted of unrecorded deeds of trust on buildings situated on leased property. As of June 9, 1974, the security agreements had not been perfected and the deeds of trust had not been recorded.

26. In excess of $40,000 of the total "loaned" to Starco was advanced on open account.

27. The only evidence of the cost of buildings and equipment purportedly securing the loans were cost figures supplied by Starco.

28. In connection with the purchase of these notes, all plaintiffs personally relied on the skill, expertise and reputation of Peters as a lawyer and district attorney.

29. Peters should have known of the issuance of a note to a non-resident of Mississippi because interest checks payable to the non-resident at his home address bore the signature of Peters.

30. NASA, by prominently displaying its charter and certificates to investors and by utilizing the phrase "registered factoring company" intended to imply that the Secretary of State recommended and approved these notes.

31. All plaintiffs are unsophisticated investors.

32. The last interest paid by NASA to note holders was paid in December, 1975.

33. Rule 138(a)(4), "General Rules and Regulations", as promulgated by the Secretary of State under the Mississippi Securities Law was in force and effect in January, 1974, at the time NASA applied for an exemption and, had the intended use of the proceeds been revealed to the Secretary, would have prevented the issuance of the certificate of exemption. The promissory notes issued by NASA were not issued in

good faith in the usual course of business, and all of the proceeds were not used for current transactions.

34. Neither Peters nor Fuller nor any other "designated corporate officer" was bonded for $1,000,000 or any amount, contrary to the representations made.

35. In connection with the offer, issue, sale and delivery of these notes, Peters acted for and on behalf of NASA as its attorney. In connection with this decision not to file a registration statement, Peters made no inquiry or investigation to determine if these notes were, in fact, exempt from registration. Further, Peters wholly failed to examine the Mississippi "Blue Sky" requirements or the regulations issued by the Secretary of State to determine the requirements of Mississippi law and, as a consequence, NASA initiated the sale of notes in violation of law. The representations contained in the promotional material submitted to the Secretary of State by Peters to secure the certificate of exemption could have been readily verified by a lawyer. Peters failed to make any effort at verification.

36. NASA never "factored" any accounts receivable.

## CONCLUSIONS OF LAW

1. The purpose of the Securities Act is to compel full and fair disclosure of all material facts in the issuance of securities so that investors can be adequately protected and make mature, investment decisions based on all relevant data. *Securities & Exchange Commission v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); *United States v. Carman*, 577 F.2d 556 (9th Cir. 1978). This purpose was violated in the present case.

2. Both the Securities Act, at 15 U.S.C. § 77b(1) and the Exchange Act, at 15 U.S.C. § 78c(a)(10), define a security to include "any note" but with the further proviso in the Exchange Act that the note must have a maturity in excess of nine (9) months. Judicial decisions have restricted the application of the Exchange Act to only those notes which are investment in nature.

Commercial transactions may be excluded. *Reid v. Hughes*, 578 F.2d 634 (5th Cir. 1978); *McClure v. First National Bank of Lubbock, Texas*, 497 F.2d 490 (5th Cir. 1974).

The term "security" embraces all investment contracts. The test is whether the investment is made in a common enterprise which is premised upon the reasonable expectation of profits solely from the managerial or entrepreneurial efforts of others. *United Housing Foundation v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621, 632 (1975); *Securities & Exchange Commission v. W. J. Howey Co., supra.* This test contains three elements: first, the investment of money; second, a common enterprise; and, third, the profits or returns are to be derived solely from the efforts of others. *Moody v. Bache & Co., Inc.*, 570 F.2d 523, 525 (5th Cir. 1978); *Securities & Exchange Commission v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 477 (5th Cir. 1974).

The court finds that all criteria are satisfied, that the notes were purchased by plaintiffs for investment purposes and constitute securities within the contemplation of the Securities Act and the Exchange Act. *Woodward v. Metro Bank of Dallas*, 522 F.2d 84 (5th Cir. 1975). Therefore, plaintiffs are purchasers of securities and are entitled to bring this action.

3. In addition to state law claims, plaintiffs seek relief under § 12 (15 U.S.C. § 77l) and § 17 (15 U.S.C. § 77q) of the Securities Act and § 10 (15 U.S.C. § 78j) of the Exchange Act and Rule 10b–5 promulgated thereunder. (17 C.F.R. § 240.10b–5).

A private right of action exists by virtue of the statutory provisions of § 12. An implied private right of action exists for violations of § 10 and Rule 10b–5. *Ernst & Ernst v. Hochfelder, supra; Woodward v. Metro Bank, supra.*

Although neither this court nor the Fifth Circuit has specifically decided whether an implied civil remedy exists under § 17(a), actions alleging violations of this provision have been decided in conjunction

with § 10b–5 claims. *John R. Lewis, Inc. v. Newman*, 446 F.2d 800 (5th Cir. 1971); *Smith v. Jackson Tool & Die, Inc.*, 419 F.2d 152 (5th Cir. 1969); *Smith v. Milam*, No. DC 73–21–K (N.D.Miss.1975). Section 10 and Rule 10b–5 are considered to be somewhat broader than § 17(a) since these provisions also refer to purchase of securities as well as their sale. The court concludes, therefore, that the requirements for a private cause of action under § 17(a) are the same as those under § 10 and Rule 10b–5 and that the plaintiffs may maintain this action under § 17(a). *Jackson v. Oppenheim*, 411 F.Supp. 659 (S.D.N.Y.1974), *aff'd in part, rev'd in part and remanded in part*, 533 F.2d 826 (2d Cir. 1976).

■ 4. Since § 10 does not contain a statute of limitations, the court must look to the analogous state statute. Miss.Code Ann. § 75–71–31 (1972), provides that any action based on a misrepresentation in connection with the sale of a security must be commenced within two years after the purchaser knew or should have known of the misrepresentations.

The applicable period of limitations under § 12 is codified in § 13 (15 U.S.C. § 77m) which provides that all actions for violations of § 12(1) must be brought within one year of the violation upon which it was based and no more than three years after the security was bona fide offered to the public. Actions under section 12(2) must be brought within one year after the plaintiff knew or should have known of the untrue statement or omission and not later than three years after the sale.

The alleged violation under § 12(1) is the failure to register the securities in accordance with the provisions of § 5(a) of the Securities Act (15 U.S.C. § 77e). In this case, the issuer repeatedly represented to the plaintiffs that these notes were "not securities" and, until a few months prior to the filing of this action, represented through lawyers that NASA was taking action to redeem all notes in full. In addition, through its lawyer, Peters, NASA represented to the Secretary of State that S.E.C. registration was "not applicable".

Certain cases hold that false representations invoke the federal tolling doctrine with respect to actions under § 12(1). *See e. g., Houlihan v. Anderson-Stokes, Inc.*, 434 F.Supp. 1319 (D.D.C.1977). Other cases are to the contrary and hold that a § 12(1) action must be commenced within one year after the sale irregardless of fraud. *See e. g., Cook v. Avien, Inc.*, 573 F.2d 685 (1st Cir. 1978) and cases cited therein.

■ Since this action was not commenced until more than one year after May 31, 1974, the last date of sale, the court, upon its own motion, concludes that plaintiffs' claims under § 12(1) are time barred by the provisions of § 13 of the Securities Act (15 U.S.C. § 77m).

However, the court further concludes that all other federal and state claims asserted by the plaintiffs, including claims under § 12(2), are timely.

■ 5. In connection with the issue, offer, sale and delivery of the unregistered securities sold to plaintiffs in interstate commerce, the issuer made or caused to be made, by written and oral communication, untrue statements of material fact in violation of the provisions of § 12(2) and § 17(a) of the Securities Act, § 10 of the Exchange Act and Rule 10b–5. These statements are:

(a) That all proceeds would be used to factor accounts receivable;

(b) That all monies loaned would be secured by first liens on lands, buildings and equipment;

(c) That all collateral was certified by independent, bonded certifiers;

(d) That security interests would be duly obtained and recorded;

(e) That NASA would acquire valid deeds of trust;

(f) That officers, agents and employees were insured by fidelity bonds;

(g) That NASA had sufficient assets or cash to redeem all notes on demand;

(h) That these notes were not securities and were exempt from securities regulation and registration;

(i) That NASA had accounts receivable which were protected by a policy of credit insurance in the amount of $3,000,000 which insured any kind of loss;

(j) That all aspects of the NASA program were fully secured and insured.

6. These written or oral representations were untrue, were material, and were made by or on behalf of the insurer with intent to deceive the plaintiffs. All plaintiffs were induced to purchase the securities and were deceived and damaged thereby in violation of the provisions of § 12(2) and § 17 of the Securities Act, § 10 of the Exchange Act and Rule 10b–5.

7. In connection with the issue, offer, sale and delivery of the unregistered securities sold to plaintiffs in interstate commerce the issuer failed and omitted to state facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading in violation of the provisions of § 12(2) and § 17(a) of the Securities Act and of Rule 10b–5. These material omissions were the failure to state that:

(a) NASA, Starco and Jackson Warehousing were alter egos controlled by the same person or persons;

(b) NASA had incurred substantial direct and contingent liability prior to the sale of the securities;

(c) Charles J. Steen was an officer, agent and controlling person of NASA and Starco and had previously been convicted of criminal violations including mail fraud;

(d) All proceeds of the sale were diverted directly to Starco and/or Steen;

(e) Starco had not qualified to do business in Mississippi;

(f) NASA and Jackson Warehousing had issued no stock and had no paid-in capital;

(g) Peters and Fuller, the so-called "presidents" of NASA considered themselves merely figureheads and that the daily operation of NASA was to be directed by Steen;

(h) Commissions were paid for the sale of these securities;

(i) Starco had never shown a profit;

(j) Controlling persons of NASA faced contingent liability as a result of violations of law by NASA of Alabama;

(k) NASA had no sinking fund in violation of regulations issued by the Secretary of State and would utilize the proceeds of the notes in violation of said regulations;

(l) All "interest" payments on the notes were, in fact, paid out of principal; and

(m) NASA had no notes or evidences of its "loans" and had loaned funds greatly exceeding the amount of the certificates.

8. These omissions were material and, if they had been stated, would have been relied on by reasonable investors, including plaintiffs. These omissions constitute violations of § 12(2) and § 17(a) of the Securities Act, and of Rule 10b–5.

9. In connection with the issue, offer, sale and delivery of the unregistered securities sold to the plaintiffs in interstate commerce, the issuer engaged in acts, practices and a course of business which operated as a fraud and a deceit and employed deceptive devices, artifices and schemes to defraud the plaintiffs in violation of the provisions of § 17(a) of the Securities Act, § 10 of the Exchange Act, Rule 10b–5 and Miss. Code Ann. § 75–71–43(b) (1972). These were:

(a) Promoted or engaged a District Attorney as the so-called "president" of NASA to imply that all investments were safe and that the offering was legal;

(b) Represented that the Secretary of State approved these securities;

(c) Failed to register the issue with the Securities & Exchange Commission;

(d) Failed to register the issue or secure an exemption therefor with the Secretary of State until after the offer began and notes were sold;

(e) Employed the acronym "NASA" and the phrase "registered factoring company" to infer government supervision;

**66**

(f) Did not secure the loans or obtain first liens or security interests contrary to the representations made;

(g) Continued to notify investors that NASA could and would redeem the notes;

(h) Failed to repay the notes;

(i) Failed to meet the requirements of law in organizing and qualifying NASA, Starco and Jackson Warehousing.

■ 10. In the case of a corporation which has issued securities in violation of law, an individual may also be personally liable if he is a participant, directly or indirectly, in connection with the offer and sale, if he materially aids and abets the issuer under certain conditions or if he is a "controlling person" of the issuer as defined by § 15 of the Securities Act (15 U.S.C. § 77o) or by § 20 of the Exchange Act [15 U.S.C. § 78t(a)].

■ To sustain an allegation of aiding and abetting under 10b–5, the plaintiffs must establish:

(a) That the primary party, as distinguished from the aiding and abetting party, has committed a securities law violation;

(b) That the aider-abettor acted with knowledge or intent; and

(c) That the assistance rendered by the aider-abettor was substantial. *Monsen v. Consolidated Dressed Beef Co., Inc.*, 579 F.2d 793 (3rd Cir. 1978); *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38 (2d Cir. 1978); *Woodward v. Metro Bank, supra.* The second criteria—the knowledge or "scienter" requirement—has posed the greatest difficulty. Some courts held that negligence was sufficient while others imposed a "flexible duty" standard grounded upon the circumstances.

In 1976, after this action was filed, the Supreme Court, held in *Ernst & Ernst v. Hochfelder, supra,* that an action under § 10 and Rule 10b–5 must include allegations of an intent to deceive, manipulate or defraud on the part of the defendant. In note 12 to the opinion, the court stated:

In this opinion the term "scienter" refers to a mental state embracing intent to deceive, manipulate, or defraud. In certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act. We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5.

■ Several circuits have addressed this issue since *Hochfelder* was decided. All have held that reckless conduct is sufficient to support liability under § 10(b) and Rule 10b–5. *Monsen v. Consolidated Dressed Beef Co., supra; Nelson v. Serwold,* 576 F.2d 1332 (9th Cir. 1978); *Cook v. Avien, Inc.,* 573 F.2d 685 (1st Cir. 1978); *Rolf v. Blyth, Eastman Dillon & Co., supra; Bailey v. Meister Brau, Inc.,* 535 F.2d 982, 993 (7th Cir. 1976). This court, therefore, concludes that reckless conduct is sufficient to satisfy the "knowing or intentional" requirement for aiding and abetting liability.

■ Reckless conduct has been defined as conduct which is "highly unreasonable" and which represents "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir. 1977). Moreover, the imposition of liability for reckless conduct is especially appropriate in cases where the alleged aider and abettor owes a fiduciary duty to the defrauded parties. *Rolf v. Blyth, Eastman Dillon & Co., supra.* In the present case, all of the individual defendants were officers or directors of, or a lawyer for the issuer or corporate participants in this scheme. All of the individual defendants, therefore, owed a direct fiduciary duty to plaintiffs.

■ 11. By the express terms of § 12(2), unlike Rule 10b–5, liability may be based on negligence and negligent omissions. *Cook v. Avien, Inc., supra; Alton Box Board Co. v. Goldman, Sachs & Co.,* 560

F.2d 916 (8th Cir. 1977). Liability under § 12(2) attaches if:

   (a) The defendant made misleading or false statements of material fact or omitted to state necessary material facts;

   (b) Plaintiffs did not know the untruth or omission; and

   (c) The defendant knew, or in the exercise of reasonable diligence could have known, of the untruth or omission.

The Court finds that these criteria are satisfied in the present case and further finds that the defendants did not sustain the burden of proof that they did not know, and in the exercise of reasonable care could not have known, of such untruth or omission.

■■■ 12. The same evidence sustains plaintiffs' right to recover under the common law of Mississippi. *Smith v. Milam*, No. DC 73–21–K (N.D.Miss.1975).

In the leading case of *H. D. Sojourner & Co. v. Joseph*, 186 Miss. 755, 191 So. 418 (1939), the court discussed the scienter requirement in common law actions and held that the intent to deceive may be found under any one of three theories:

   (a) A statement was made with actual knowledge of its falsity (actual knowledge);

   (b) A statement was made recklessly without knowledge or disregard of either truth or falsity (reckless disregard); or

   (c) A statement was made under circumstances which indicate that the speaker should have known it was false, irrespective of whether or not he actually knew it was false. (imputed knowledge).

*Sojourner* further holds that the false statement does not have to be the predominating inducement to act. If the statement was false, was a material factor inducing a third person to act in reliance to his detriment, and if reliance by the third person was reasonably foreseeable to the speaker or author of the statement, then the speaker or author is liable for damage proximately caused thereby. The Court finds that all of these criteria are satisfied in the present action.

13. Therefore, the Court finds that the defendants NASA, Starco, Jackson Warehousing, Steen, Mrs. Steen, Fuller and Dukes were participants, aiders and abettors and co-conspirators acting in concert to promote the issuer. The Court further finds that the defendants Steen, Mrs. Steen, Fuller and Dukes were controlling persons of the issuer within the contemplation of The Securities Act and the Exchange Act. The Court finds that all of said defendants named in this paragraph are liable to plaintiffs for violations of Mississippi statutory and common law. The liability of the defendant Peters will be discussed below.

14. The lawyer for the issuer plays a unique and pivotal role in the effective implementation of the securities laws. As a result, special duties are imposed on the lawyer.

> "The securities laws provide a myriad of safeguards designed to protect the interests of the investing public. Effective implementation of these safeguards, however, depends in large measure on the members of the bar who serve in an advisory capacity to those engaged in securities transactions. *Securities & Exchange Commission v. Spectrum, Ltd.*, 489 F.2d 535, 536 (2nd Cir. 1973).

■■■ The duty of the lawyer includes the obligation to exercise due diligence, including a reasonable inquiry, in connection with responsibilities he has voluntarily undertaken. A lawyer has no privilege to assist the insurer circulate statements which he knows or should know to be false simply because they were furnished to him by his client. *Securities & Exchange Commission v. Frank*, 388 F.2d 486, 489 (2nd Cir. 1968). He must make a reasonable, independent investigation to detect and correct false or misleading materials. *Escott v. Barchris Construction Corp.*, 283 F.Supp. 643 (S.D.N. Y.1968). Moreover, the greater the relationship and duty to the purchaser of securities, the higher the standard of care for investigation and disclosure. *Woodward v. Metro Bank, supra.*

In the present case, Peters owed a special duty of diligent investigation and disclosure. Not only was he the lawyer responsible for the issuer's compliance with applicable laws, he also permitted his name (and his office) to be exploited as "president" of NASA when he clearly knew the daily operation of NASA would be controlled by Steen. He permitted NASA to utilize his signature stamp and made no effort to determine how his signature was being used.

Peters and Steen jointly decided not to file a registration statement when a reasonable inquiry by Peters clearly would have revealed that no exemption was available for the sale of these securities. Peters failed to even attempt to determine the registration requirements of Mississippi law and, as a result, NASA initiated the sale of these securities in violation of law.

Peters, as lawyer for the issuer, secured an exemption based on promotional material furnished to him by Steen. He did not make a reasonable inquiry to ascertain the truth or falsity of the representations when these statements could have been readily verified by a lawyer. He secured the certificate of exemption without which these securities would not have been offered or sold when he knew or should have known that NASA was in violation of law, had issued no stock and had no paid-in capital. During the term of the offering, when Peters had ample opportunity to detect the misrepresentations, he failed to report violations to NASA, to the Secretary of State of to the Securities & Exchange Commission.

The court concludes that without the active, affirmative assistance of Peters as lawyer for the issuer, including the use and exploitation of his name, the sale would not have been accomplished. Therefore, under applicable law, Peters was a participant in the sale and is jointly liable with the issuer for all damages. *Black & Company v. Nova-Tech, Inc.*, 333 F.Supp. 468, 472 (D.Ore.1971).

Further, the Court concludes that, because of his approved designation as "president" and his role in connection with the sale, Peters was a controlling person of the issuer and is jointly liable for all violations of the Securities Act and the Exchange Act.

Peters, moreover, materially and substantially aided and abetted the issuer in connection with the offer and sale of these securities. The "scienter" requirement is satisfied because the evidence establishes overwhelmingly that Peters' conduct was grossly negligent and reckless. His conduct was an extreme departure from and a gross violation of the duties imposed on him as lawyer for the issuer. The preparation and assistance with the materially false and misleading statements and the course of conduct of Peters clearly imposes aiding and abetting liability on him as a matter of law. *Securities & Exchange Commission v. National Student Marketing Corp.*, 402 F.Supp. 641 (D.D.C.1975).

The legal services performed or which should have been performed by Peters were undertaken not only for the benefit of the issuer but also, under the securities laws, for the benefit of the purchasers of securities. The plaintiffs here were foreseeable and intended third-party beneficiaries of Peters' legal services and skill. It was foreseeable (and, indeed, known) to Peters and NASA that the plaintiffs and all purchasers of these securities would rely on him. Peters voluntarily assumed a relationship not only with NASA but also with the purchasers of these securities. The law and public policy require that the attorney exercise his position of trust and superior knowledge responsibly so as not to adversely affect persons whose rights and interests are certain and foreseeable. *E. g. Rusch Factors, Inc. v. Levin*, 284 F.Supp. 85, 91–92 (D.R.I. 1968); *Heyer v. Flaig*, 70 Cal.2d 223, 74 Cal.Rptr. 225, 449 P.2d 161 (1969). Peters' duty to these plaintiffs was breached by his reckless and grossly negligent conduct.

The court concludes, therefore, that Peters, as lawyer for the issuer, is jointly liable for all violations of § 12(2) and § 17(a) of The Securities Act, § 10(b) of the Exchange Act, Rule 10b–5, Mississippi "Blue Sky" law and common law.

15. The measure of damages to the plaintiffs under the federal claims is their total actual loss, in this case $145,900.00 less $60,000.00 previously received in settlement from other defendants, together with legal interest from and after the date of sale until paid.

■ Under state statutory claims, plaintiffs are entitled to recover the actual loss and legal interest thereon. In addition, plaintiffs are also entitled to recover reasonable attorney's fees. *See* Miss.Code Ann. § 75–71–25 (1972); *Smith v. Milam*, No. DC 73–21–K (N.D.Miss.1975). The fact that a bond was not posted does not preclude plaintiffs from full recovery under this provision. *Irving v. Bankers' Mortgage Co.*, 169 Miss. 890, 151 So. 740 (1934).

■ Punitive damages may be awarded where recognized under state law and a state law violation is joined with federal claims. *Coffee v. Permian Corp.* 474 F.2d 1040 (5th Cir.), *cert. denied*, 412 U.S. 920, 93 S.Ct. 2736, 37 L.Ed.2d 146 (1973); *Smith v. Milam, supra.*

■ Plaintiffs urge the court to award punitive damages against all defendants. The rule is firmly established in Mississippi, that "punitive damages are recoverable not only for willful and intentional wrong, but for such gross and reckless [conduct] as is, in the eyes of the law, the equivalent of willful wrong". *Teche Lines v. Pope*, 175 Miss. 393, 166 So. 539, 540 (1936); *e. g., Anderson v. Eagle Motor Lines, Inc.*, 423 F.2d 81, 84 (5th Cir. 1970) (Miss. case); *Seals v. St. Regis Paper Co.*, 236 So.2d 388, 392 (Miss.1970). The award of punitive damages, and the amount thereof, if any, rests in the discretion of the trier of the facts. *See Mayfield v. Johnson*, 202 So.2d 630, 631 (Miss.1967).

■ Since punitive damages are punishing damages and are accessible only as an example and warning to others, they are not a favorite in the law and are to be allowed only with caution and within narrow limits. *Lee v. Southern Home Sites Corporation*, 429 F.2d 290, 294 (5th Cir. 1970).

In *Fowler Butane Gas Co. v. Varner*, 244 Miss. 130, 141 So.2d 226 (1962), the Mississippi Supreme Court said:

This Court has pointed out that " * * * in punitive or exemplary damages the award is in the nature of a punishment for wrongdoing and an example, so that others may be deterred from the commission of such wrongs and the public be properly protected." *Yazoo & M. V. R. Company v. May*, supra, [104 Miss. 422, 61 So. 449] . . . .

We have said "Punitive damages are punishing damages, and are awarded to the injured party as a reward for public service in bringing the wrongdoer to account." *Neal v. Newburger Company*, 154 Miss. 691, 123 So. 861. On the other hand, it must be borne in mind that punitive damages may be recovered not only for wilful and intentional wrong, but for such gross and reckless negligence as is, in the eyes of the law, equivalent to wilful wrong. . . .

141 So.2d at 233–34 (Citations omitted).

■ The evidence in the action, in the judgment of the court, would sustain an award of punitive damages against some or all of the defendants. The court, however, doubts the wisdom of making such an award. In the case of defendant Peters, the evidence does not show that he profited financially in any way in the subject transactions and the court cannot find that he intended to defraud plaintiffs. The same can be said as to defendant Fuller. Their actions, however, as have been hereinbefore discussed, render them liable for compensatory damages. As to the other defendants, two are in bankruptcy and two have felony convictions from which appeals have not been determined. The court does not believe an award against either of them would serve a useful purpose.

The court has decided to reject plaintiffs' request for punitive damages, as such, awarding only reasonable attorney's fees.

■ The amount of the attorney fee can be fixed by the court by applying its own expertise in such matters to the circum-

stances of the case. The file indicates that a tremendous amount of time has been required on the part of plaintiffs' counsel to process and try the lawsuit. The action involves complex and difficult legal questions. Counsel has been successful. The court is conversant with the usual and customary charges made by the members of the bar of this court, and the hourly rate which prevails.[1] In fixing the fee the court has considered the principles enunciated in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974).

The court finds that a reasonable attorney fee to be awarded plaintiffs is the sum of $25,000.00.

### SUMMARY

(1) The court finds that plaintiffs are entitled to recover the principal amount of $145,900.00, plus interest at 8 per cent per annum from May 31, 1974, to November 30, 1978, amounting to $53,269.47, or a gross amount of principal and interest in the sum of $199,169.47. Against this amount, however, there is allowed a credit of $60,000.00, plus interest at 8 per cent per annum from October 4, 1978, to November 30, 1978, in the sum of $760.00. This makes the net award $138,409.47, for principal and interest. To this amount will be added the award of attorney fees in the sum of $25,000.00, making the total recovery $163,409.47, and costs to be taxed.

(2) Judgment shall be entered in favor of each plaintiff for his, her or their share in the gross recovery, against all defendants, jointly and severally, except those defendants with whom a settlement was reached during trial, and with the further exception that the recovery against defendant Fuller will be limited to the recoveries made by those plaintiffs who purchased notes, on and after April 30, 1974, the day after Fuller became the President of NASA.

Plaintiffs' counsel shall submit to the court within 10 days from the date of this memorandum a list of plaintiffs, designating the recovery to which each is entitled by virtue hereof. A copy of the list shall be served on opposite counsel, who shall have five (5) days thereafter to point out any error in the calculations appearing on the list. Upon approval of the amounts by the court, the clerk will enter the proper judgment.

---

1. Former decisions of this court have allowed fees based on hourly charges of from $35.00 to $45.00: *Payne v. Travenol Laboratories, Inc.*, 74 F.R.D. 19 (N.D.Miss.1976); *Ayers v. West-ern Line Consolidated School District*, 404 F.Supp. 1225 (N.D.Miss.1975); *Armstead v. Starkville Municipal Sep. School District*, 395 F.Supp. 304 (N.D.Miss.1975).